**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Thelbert C. ELDERS,**
**Defendant-Appellant.**

**No. 77–1181.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1977.
Decided Feb. 1, 1978.

---

Sherman C. Magidson, Francis E. Andrew, Carl P. Clavelli, Georgette Pantusos, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., John E. Burns, Leida B. Schoggen, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, SWYGERT and BAUER, Circuit Judges.

SWYGERT, Circuit Judge.

In this appeal our principal concern is the nature of the effect on interstate commerce needed to establish jurisdiction under the Hobbs Act.

An eleven-count indictment, filed October 30, 1975, charged Thelbert C. Elders with violating the federal tax laws and the Hobbs Act. Subsequently, the grand jury returned a superseding indictment, changing the dates of the periods in the two extortion counts. Before trial the Government dismissed the first two counts and the indictment was renumbered accordingly. The charges on which the defendant went to trial can be summarized as follows:

Counts One, Three, Five, and Seven: violation of 26 U.S.C. § 7206(1) by filing a false income tax return for 1970, 1971, 1972, and 1973 respectively.

Counts Two, Four, and Six: violation of 26 U.S.C. § 7201 by evasion of income tax for 1970, 1971, and 1972 respectively.

Count Eight: violation of the Hobbs Act, 18 U.S.C. § 1951 by obtaining $11,830 from William Hall during the period from October 1969 to March 1971.

Count Nine: violation of the Hobbs Act by obtaining $16,408 from Russell Fierge and Richard Blake during the period from May 1970 to July 1973.

Following a jury trial, the defendant was convicted of filing a false income tax return (Count Seven) and of extortion (Count Nine). After the jury failed to reach a verdict on the remaining counts and the trial court declared a mistrial as to those charges, the Government dismissed Counts One through Six and Count Eight. On Count Nine, Elders was sentenced to the custody of the Attorney General for a period of eighteen months. Sentence was suspended on Count Seven, and the defendant was given three years probation to start following his prison sentence. The defendant has appealed his conviction under Count Nine, challenging the jurisdictional basis for the Hobbs Act charge. He also alleges that two trial errors require a reversal on both counts.

I

In 1967 defendant Elders became Street Department Foreman for the Village of Maywood, a Chicago suburb. In August 1970 he was appointed acting Public Works Director for the village, and on October 1, was made Director. Elders held that position through June 1973.

In July 1970 Russell Fierge and Richard Blake merged their separate tree service enterprises into the Illinois Shade Tree Company (IST) to provide tree service in the western suburbs of Chicago. Blake ran the company's office while Fierge handled the public relations and supervised the work. IST began receiving contracts through Elders for tree removal work in Maywood. Fierge, having previously worked for the village, told Blake that because the village was "wired," kickbacks of ten percent of the gross billings would have to be paid to one or more of its officials. After submitting billings and receiving payments therefor, Blake gave money to Fierge who in turn delivered the cash to Elders.

In 1970 Fierge made three or four payments to Elders, the largest being $400 and the smallest $100. During part of 1971, Fierge continued to pay Elders ten percent of the payments received from Maywood;

after that Blake made the payments. This arrangement continued throughout 1972 and part of 1973. In 1973 Blake gave cash to Elders on three occasions: first, in mid-May IST received a $503.50 check from Maywood for work previously done, and Blake gave Elders a ten percent kickback; second, on June 6 Blake submitted one bill for $650 and another for $2000 for clearing a vacant lot in Maywood, and upon payment gave Elders and the president of the Maywood Park District $1000 in cash; and third, on June 15 Blake paid Elders $500 for the sale to Maywood of a stump removing machine which IST owned. After admitting evidence of the June 6, 1973 transaction, the trial court ruled that the jury should not consider the evidence as substantive proof inasmuch as Elders received the money in his capacity as an official of the Maywood Park District rather than as Public Works Director; therefore the transaction fell outside the scope of Count Nine.

## II

The defendant's major contention for reversal is that the Government failed to show IST's involvement with interstate commerce at the critical times charged in Count Nine. After noting that Count Nine charged a continuing extortion of Blake and Fierge from May 1970 through June 1973, the defendant argues that because IST did not purchase any equipment through interstate commerce after mid-1971, extortion of IST subsequent to that time could not fall within the perimeters of the Hobbs Act. The defendant further argues that the trial court should have excluded evidence of any extortionate payment made subsequent to Blake and Fierge's early 1973 decision to terminate their business. The record shows that Fierge left IST in February 1973 and thereafter Blake ran the company alone until its dissolution. The two had agreed that Blake would sell all unmortgaged company property and the proceeds would be divided. In early June Blake sold a quantity of equipment at auction, and the company was substantially liquidated by August 1973.

In response, the Government contends that the Elders extortions during the 1970 through 1973 period charged in Count Nine had at least a *de minimis* effect on commerce and were sufficient to meet the jurisdictional requirement of the Hobbs Act. The Government makes three arguments: (1) that the use of equipment purchased or manufactured out-of-state was sufficient to establish jurisdiction; (2) that IST engaged in out-of-state work during the period in question; and (3) that either the extortionate payments depleted the assets of IST and/or the inflated prices paid by Maywood depleted its treasury, thereby impairing the ability of either or both to do business interstate. The Government also contends that the planned termination of IST did not alter the fact that commerce was affected.

■ The Hobbs Act, enacted to cope with the problem of racketeering, "the levy of blackmail upon industry,"[1] was intended to eliminate interference with the flow of interstate commerce. The broad language of the Act manifests "a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. . . [and] outlaws such interference 'in any way or degree.'" *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960).

■ Courts have consistently held that the Act should be given an expansive interpretation to cover a wide range of extortionate activity.[2] In each case, however, a

---

1. *United States v. Local 807*, 118 F.2d 684, 688 (2d Cir. 1941), *rev'd*, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942). For further discussion of the Hobbs Act, see *United States v. Staszcuk*, 517 F.2d 53, 56–59 (7th Cir.) (*en banc*), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); Note, *Extortion "Under Color of Official Right": Federal Prosecution of Official* *Corruption Under the Hobbs Act*, 5 Loyola U.L.J. 513, 514–18 (1974).

2. *Hulahan v. United States*, 214 F.2d 441, 445 (8th Cir.), *cert. denied*, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954) (extortion or attempted extortion which actually or potentially in any way affects interstate commerce); *United*

nexus has been required between the extortionate conduct and interstate commerce in order to establish federal jurisdiction. That nexus may be *de minimis, United States v. DeMet,* 486 F.2d 816, 822 (7th Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), but it must nonetheless exist. Additionally, the connection with or effect on interstate commerce must have been at least a "realistic probability" at the time of the extortionate act. *United States v. Staszcuk,* 517 F.2d 53, 59–60 (7th Cir.) (*en banc*), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

### A. *Out-of-State Purchases of Equipment*

To establish a nexus with interstate commerce, the Government focuses on IST's use of equipment which was either manufactured or purchased outside of Illinois. In June 1970 Dixie Tree (IST's predecessor) purchased a Chevy Hi-Ranger manufactured in Indiana. In October 1970 IST bought two trailers manufactured in Michigan. IST purchased a Bobcat and a trailer in Missouri, a truck chassis in Wisconsin, and an aerial tower in Michigan. A stump remover was manufactured in Iowa. The record shows that IST made its final interstate purchase of equipment in mid-1971.

■ The Government argues that the extortions demanded by Elders were necessary for IST to obtain business in Maywood.

"Thus, Elders' demands, if not met, would have tended to prevent the equipment from being used after it had 'come to rest' in Illinois, thereby damming up the stream of commerce. . . ." We fail to see the logic of the Government's argument, particularly in light of the fact that IST was being dissolved at the time of the 1973 extortions. There was not even a "realistic probability" that any equipment would be replaced or any additional equipment purchased. IST's cessation of interstate purchases of equipment in mid-1971, combined with the decision in early 1973 to terminate its business, distinguish this case from those cited by the Government to support its position.[3]

### B. *IST's Out-of-State Work*

The Government next contends that the commerce requirement is satisfied by IST's work outside of Illinois. Testimony at trial showed that IST performed work in Florissant, Missouri in 1971 or 1972, in the St. Louis, Missouri area in early 1973, and in Gary, Indiana during 1972. The Government contends that this out-of-state work required use of IST equipment in other states, and that there was a "reasonable probability" that IST would have performed other out-of-state jobs. We do not agree.

---

*States v. Pranno,* 385 F.2d 387, 389 (7th Cir. 1967), *cert. denied,* 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 (1968) (extortion by threat which, if carried out, would obstruct commerce); *United States v. Amabile,* 395 F.2d 47, 49–50 (7th Cir. 1968), *vacated on other grounds,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (extortion which depletes corporate assets); *United States v. DeMet,* 486 F.2d 816, 821–22 (7th Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) (extortionate conduct having a *de minimis* effect on commerce—depletion of assets); *United States v. Staszcuk,* 517 F.2d 53 (7th Cir. 1975) (*en banc*) (extortion which has a "realistic probability" of affecting interstate commerce); *United States v. Mazzei,* 521 F.2d 639 (3d Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975) (extortionate activities which place indirect burdens on interstate commerce such as depletion of assets).

**3.** In *United States v. Crowley,* 504 F.2d 992, 997–98 (7th Cir. 1974), this circuit held that the jurisdictional requirements were met by both the customary purchase of supplies and equipment from out-of-state as well as depletion of assets which curtailed the victim's potential as a purchaser of such goods. In *Battaglia v. United States,* 383 F.2d 303 (9th Cir. 1967), *cert. denied,* 390 U.S. 907, 88 S.Ct. 817, 19 L.Ed.2d 874 (1968), the court found the requisite interference with interstate commerce because the extortionate act prevented use of an article recently shipped in interstate commerce. Certain of the victims involved in *United States v. Hyde,* 448 F.2d 815 (5th Cir. 1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), were companies being formed "with a stated purpose of going into the activities that support a finding of interstate commerce." The other victims, "although local in many ways, had significant interstate aspects." 448 F.2d at 836.

The testimony relating to IST's out-of-state jobs was far from conclusive and, at any rate, failed to establish any plans for such employment after the decision to terminate the business. When that decision is considered along with the fact that IST out-of-state employment was sporadic and incidental to its work in Illinois, it becomes clear that in arguing that the out-of-state work provides an independent basis for jurisdiction, the Government is grasping at straws. Except for a depletion of assets theory, which we will later address, the Government's contention makes no sense. Without some evidence of at least a realistic probability that Elders' extortions might have prevented IST from obtaining additional out-of-state work, there can be no logical connection between IST's out-of-state employment and the Maywood extortions. The case was not tried on that theory.

## C. Depletion of IST Assets

The defendant notes that "[t]he indictment did not charge, the government did not attempt to prove, and the jury was not instructed on a depletion of assets theory," and contends that under *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), such a variance cannot stand. The Government takes an opposite stance and, in fact, relies heavily on the depletion of assets theory. It argues that despite the absence of an explicit indictment charge or jury instruction, the jury could have found that the extortionate payments depleted the company's assets and thereby affected commerce. We need not reach this argument because we find that the depletion of assets theory is not applicable to the 1973 extortions, and for that reason there must be a retrial.

Under the depletion of assets theory, commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods. *United States v. DeMet*, 486

F.2d 816, 822 (7th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); *United States v. Mazzei*, 521 F.2d 639, 642 (3d Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). Here IST neither actively engaged in nor customarily purchased items through interstate commerce. IST was engaged in servicing trees in the Chicago area. The last interstate purchase of equipment by IST occurred in mid-1971, and certainly there was no "realistic probability" of any interstate purchases once Blake and Fierge had decided to go out of business. In sum, under a depletion of assets theory, the 1973 extortions did not and could not have had the requisite effect on commerce.

## D. Inflated Prices Paid by Maywood

As an alternative theory, to show an interstate commerce connection, the Government contends that artificially inflated prices paid by Maywood to IST depleted the village treasury and thereby constituted an effect on commerce. The Government argues that any inflated payment meant that the village had to use funds that would otherwise have been available for municipal projects requiring the use of goods shipped in interstate commerce, or the performance of services by contractors involved in interstate commerce. This weak argument is indicative of the frailty of the Government's position that Hobbs Act jurisdiction exists in this case. Although the Act requires only a *de minimis* effect on commerce, the effect still must be more than a speculative, attenuated "one step removed" kind of effect.

The inflated price issue was never raised in the trial court. No proof was introduced at trial as to the amount of either the inflated prices paid by Maywood or the depletion of Maywood's assets, or, in fact, whether Maywood even purchased goods in interstate commerce or used the services of interstate businesses. The burden was on the Government to establish Hobbs Act jurisdiction through evidence of some nexus between interstate commerce and the extortionate conduct alleged and

proved under Count Nine. The Government failed to carry its entire burden. Under these circumstances, the question arises as to the extent of the relief to which the defendant is entitled.

The defendant argues that because the jury failed to reach a verdict on the tax counts for the years 1970, 1971, and 1972 (Counts One through Six), we must conclude that the jury did not find him guilty of extortion for those years as charged in Count Nine. Upon that premise, he maintains that the jury could only have found him guilty on Count Nine for the 1973 extortions which he says, and we have agreed, do not come within Hobbs Act jurisdiction. We do not agree, however, that a dismissal on Count Nine is therefore required.

 We cannot, as a matter of law, recognize any inconsistency, even though arguable, between the jury's inability to reach a verdict on the tax counts for 1970–72 and its verdict of guilty on Count Nine charging the defendant with extortion from May 1970 to July 1973. It is settled that a jury may convict on some counts and not on others even though they are closely related. *Dunn v. United States*, 284 U.S. 390, 394, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *Hamling v. United States*, 418 U.S. 87, 101, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). The defendant invites us to speculate on why the jury was unable to reach a verdict on the tax counts for 1970–72 and yet rendered a verdict on the 1973 tax count and on Count Nine. Such speculation cannot overturn a verdict, *Dunn*, 284 U.S. at 394, 52 S.Ct. 189. Since we reject defendant's contention, the only relief to which he is entitled is a new trial on Count Nine. It was error on the part of the trial court not to sustain defendant's objection to the admission of the extortion payments in 1973.

## III

Because Elders' conviction under Count Nine is vacated for jurisdictional reasons, we need not address two other issues raised on appeal which are directed to that count.[4] However, since the final issue is directed to Count Seven as well as to Count Nine, that issue warrants discussion.

The defendant contends that the trial judge abused his discretion by limiting the cross-examination of Blake. Specifically, the defendant argues that by not permitting adequate cross-examination about Blake's financial affairs after the period covered by the indictment, the court did not give the defense an adequate opportunity to explore the facts which would support its defense theory, namely, that the cash generated by the inflated billings was kept by Blake rather than given to Elders.

 Because a trial judge has broad discretion in determining the scope and extent of cross-examination,[5] his rulings will not be reversed absent a showing of abuse of discretion. As the defendant acknowledges, the judge was quite aware of the defense theory and, therefore, did permit extensive cross-examination of Blake. It was within the judge's discretion to limit the cross-examination, as he did, with respect to Blake's cash expenditures after late-1973. We find no abuse of discretion.

The defendant's conviction under Count Seven is affirmed; his conviction under Count Nine is vacated and the cause is remanded for a new trial.

BAUER, Circuit Judge, dissenting.

I respectfully dissent. The opinion, if I read it correctly, reverses the conviction on

---

**4.** The defendant asserts (1) that the trial judge should not have permitted the jury to consider evidence of Elders' payments after Blake began cooperating with Internal Revenue Service agents in January 1973, and (2) that the trial court committed reversible error in returning the jury to deliberate on Count Nine after a jury poll revealed that one juror was uncertain about her vote and was confused.

**5.** *See, e. g., United States v. Isaacs*, 493 F.2d 1124, 1162 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146, *reh'g denied*, 418 U.S. 955, 94 S.Ct. 3234, 41 L.Ed.2d 1178 (1974).

Count IX because part of the evidence as to extortion payments could not, says the majority, have even a minimal effect on interstate commerce. Even if that were true, the evidence of extortion affecting interstate commerce on the other payments prior to the decision of the "victim" company to dissolve was overwhelming. Much of the equipment used by the company was manufactured out-of-state, and the company performed jobs out-of-state throughout the period charged, including 1973.

The majority opinion says that "the testimony relating to IST's out-of-state jobs was far from conclusive," but this ignores the testimony which discusses various jobs outside of Illinois that were still in progress in 1973. Moreover, the testimony described eight separate purchases of out-of-state equipment used in Maywood—all substantial purchases.

The 1973 payments to Elders were extortion payments for regular tree and landscape work done in Maywood that year and for the sale to Maywood by IST of a "tree stumper." The majority opinion finds that, since IST had decided to phase itself out of business in early 1973, payments made after that decision could not have even a minimal effect on interstate commerce. This ignores the fact that goods in interstate commerce were used on the regular tree work in 1973, and indeed, the very tree stumper purchased from IST by Maywood—for which Elders received a kick-back—was manufactured in Iowa. Since Maywood had determined that it needed a stumper, why is it not logical that the Village would have purchased such a piece of equipment from another out-of-state manufacturer? Why does not the sale of the out-of-state equipment of itself satisfy the "affecting interstate commerce" requirement? In my view, the effect on interstate commerce that is the jurisdictional requirement was adequately met to uphold the 1973 transactions regardless of whether the decision to "phase out" had been made.

This Court has held, as the majority agrees, that the Act should receive an expansive interpretation to cope with "the levy of blackmail upon industry." Further, we have upheld convictions where the extortion payment was demanded and paid *after* the event which had any possibility of affecting commerce had occurred. *United States v. Kuta*, 518 F.2d 947 (7th Cir. 1975). We also affirmed a conviction where *no* effect on interstate commerce *ever* occurred—only a proposal, later abandoned, to build a building which *probably* would have required purchases out of state. *United States v. Staszcuk*, 517 F.2d 53 (7th Cir. 1975) (Judges Swygert and Sprecher dissenting). With the opinion in this case, we have turned our backs on the "expansive interpretation to cover a wide range of extortionate activity" and have opted for a narrow alley of jurisdictional footpaths. I would affirm.