UNITED STATES of America,
Plaintiff-Appellee,

v.

James A. BLAKEY and Louis A. Berry,
Defendants-Appellants.

Nos. 78–2579, 78–2589.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1979.

Decided Oct. 25, 1979.

Donald Hubert, Chicago, Ill., for defendants-appellants.

Thomas P. Sullivan, U. S. Atty., J. Daniel Stewart, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, SPRECHER and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

The defendants, Chicago police officers James Blakey and Louis Berry, were convicted by a jury of extortion and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.[1] They appeal, alleging several grounds for reversal of their convictions. First, the defendants argue that there is no federal jurisdiction over the alleged offenses because the government failed to prove the connection with interstate commerce required under the Hobbs Act. Second, the trial court's action admitting into evidence recorded statements of the deceased victim of the alleged extortion violated defendants' Sixth Amendment confrontation rights and the rule against hearsay, Fed.R.Evid. 802. Third, the trial court's actions, during pre-verdict and post-trial hearings on the admissibility of the tape recording, constituted an abuse of discretion and a denial of due process. Finally, defendants assert that the prosecutor's reference, during closing argument, to facts not in evidence and the trial court's reprimand of defense counsel during that argument deprived defendants of a fair trial with effective assistance of counsel. We find all of the arguments raised by defendants without merit and affirm their convictions.

---

1. A third defendant charged with the same offenses was acquitted in a bench trial conducted simultaneously with the jury trial of these defendants.

## I

On July 31, 1976, a shop operated by Leo Dyer at 6724 South Halsted Street in Chicago was under intensive Federal Bureau of Investigation (F.B.I.) and Chicago Police Department surveillance. The F.B.I., pursuant to court order, had planted microphones inside the shop and had placed a wire tap on the shop's telephone. The Chicago Police Department, investigating suspected police corruption, maintained physical surveillance of the shop. Both operations were conducted from an apartment in a building across the street from Dyer's establishment.[2] Dyer attracted this attention because he was believed to be engaged in the illegal sale of narcotics and stolen property and in "paying off" Chicago police officers.

At approximately 4:00 p. m. on July 31, 1976, three men identifying themselves as police officers entered the shop, ostensibly to search for narcotics pursuant to a search warrant. It is undisputed that two of the men were the defendants, Officers Blakey and Berry. It is similarly undisputed that neither officer was assigned to the district in which the shop was located, that both officers were off-duty on July 31, 1976, and that no search warrant had been issued to either officer during July, 1976.

Upon entering the shop, the three officers searched Dyer and several other persons there with him. Dyer was directed to place the contents of his pockets on top of a freezer; among the items placed there were a large roll of currency and Dyer's keys. During the search, Alphonzo Pitman,[3] the son of one of the women in the shop with Dyer, knocked on the door. He testified that he looked in the window and saw one of the officers counting Dyer's money and that Officer Berry came to the door and identified himself as a police officer. A short time later, Pitman's mother and the other woman in the shop were released and joined him outside. Remaining in the shop were the three police officers, Dyer, and Timothy McCutchen, an associate of Dyer's with a criminal record.

After the personal searches were completed, the officers began searching the shop. While the evidence indicates that Dyer was in the new and used tire business, the shop also contained various items of other merchandise bought and sold by Dyer. The search apparently was quite extensive, with the officers moving merchandise and boxes to facilitate their examination of the premises. Two guns were found, one of which, a shotgun, was fired inside the shop by one of the officers. The noise caused Iva Lee Jackson, one of the women who had left the shop, to look through the shop's window. Ms. Jackson saw Dyer's roll of money still on the freezer and also saw a foil packet containing heroin found during the search. The defendants then called Dyer to the rear of the shop; one of them picked up Dyer's roll of money and carried it into the rear with him. The two officers and Dyer remained in the rear for almost fifteen minutes when the third officer joined them; all three officers emerged approximately one minute later and began filling paper bags with merchandise from the shop. The officers were observed leaving the shop by the surveillance personnel across the street. Before the officers reached their car, Alphonzo Pitman ran after them, at Dyer's request, to retrieve Dyer's keys, which had been next to the money on the freezer; Officer Blakey gave Pitman the keys.

The F.B.I. electronic surveillance team recorded a number of conversations in the shop during the defendants' visit and after their departure. These recorded conversations will be described where relevant in the discussion that follows. Leo Dyer died of natural causes prior to trial and thus was

---

**2.** In fact, the wire tap was monitored and recorded from the F.B.I.'s Chicago office; the conversations detected by the in-shop microphones, however, were monitored and recorded from the building across the street from the shop.

**3.** Mr. Pitman's name appears in the record as both "Pitman" and "Pittman." Since "Pitman" is the spelling he gave while testifying, we will adhere to that spelling.

unavailable for cross-examination as to his recorded statements. The defense theory at trial was that the defendants had taken no cash from Dyer and had paid for the merchandise they carried from the store. Apparently, the jury found this theory unconvincing.

## II

Defendants' first argument on this appeal is that Dyer's shop was not a tire shop at all; rather it was an illegal heroin and fencing operation not constituting "commerce" under the Hobbs Act.[4] Defendants do not deny that some of the tires purchased by Dyer reached his shop through interstate commerce; they argue instead that the tire purchases and sales were a sham, engaged in only to provide a legitimate "front" for Dyer's wholly illicit business. Alternatively, defendants argue that even if the Hobbs Act extends to Dyer's shop, the government has failed to show that the alleged extortion affected interstate commerce. The government concedes that Dyer's illegal activities far exceeded, in dollar volume, his tire sales. The government argues, nonetheless, that the evidence reveals sufficient legitimate business activity to fall within the scope of the Hobbs Act.

██ Although federal criminal statutes typically receive a narrow construction, the Hobbs Act's interstate commerce requirement has been construed expansively. *U. S. v. Elders*, 569 F.2d 1020, 1023 (7th Cir.

1978); *U. S. v. Staszcuk*, 517 F.2d 53, 58 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). The expansive construction is dictated by the congressional intent that the Act employ the full federal commerce power. *Staszcuk*, 517 F.2d at 58; *U. S. v. DeMet*, 486 F.2d 816, 821 (7th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). As the Supreme Court has stated:

[The Hobbs] Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.

*Stirone v. U. S.*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). In determining whether the requisite connection with interstate commerce exists, we must view the evidence in the light most favorable to the government. *Glasser v. U. S.*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *U. S. v. Merolla*, 523 F.2d 51, 53 (2d Cir. 1975); *U. S. v. Mazzei*, 521 F.2d 639, 643 (3d Cir.) (en banc), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *U. S. v. Crowley*, 504 F.2d 992, 995 (7th Cir. 1974).

██ The evidence in this case reveals that, although Dyer primarily engaged in illegal activity, he also engaged, to some extent, in the legitimate sale of new tires which reached his shop through interstate commerce.[5] The testimony of several wit-

---

4. The Hobbs Act, 18 U.S.C. § 1951, provides, in relevant part:

§ 1951. Interference with commerce by threats or violence

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

*   *   *   *   *   *

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or

threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

*   *   *   *   *   *

5. The fact that the tires may be said to have come to rest upon reaching Dyer's shop will not disturb the connection with interstate commerce. *U. S. v. Irali*, 503 F.2d 1295, 1298 (7th Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); *U. S. v. Gill*, 490

nesses indicated that Dyer had been engaged in the tire business at least since 1973; invoices from Dyer's tire purchases were in the name of "Leo's Tire Service" and "Leo's Halsted Tire Shop";[6] and the invoices indicate that Dyer spent over $2000 on new tire purchases during the first ten months of 1976. This evidence shows that some legitimate business activity affecting commerce took place in Dyer's shop.

The defendants and the government agree that no authority indicates whether the Hobbs Act applies to wholly illegal businesses. We need not consider this issue because it is clear that Dyer's business had a legitimate facet. We can find no cases stating that legitimate commercial activity is drawn outside the coverage of the Hobbs Act when it is conducted together with a much more profitable illegal business.[7] On the contrary, Hobbs Act extortion convictions have been upheld where the victim of the extortion was a legitimate business involved in some, albeit quite minor, illegal activities. See, e. g., *U. S. v. Braasch*, 505 F.2d 139, 142–43 (7th Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 1562, 43 L.Ed.2d 775 (1975); *U. S. v. Pacente*, 503 F.2d 543, 545 (7th Cir.) (en banc), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974). These decisions indicate that the presence of some illegality in the victimized business does not *per se* remove it from the Act's coverage. Similarly, a Hobbs Act conviction has been upheld where the extortion was directed against a "dummy" corporation, a business operated by the F.B.I. to facilitate detection of official corruption. *U. S. v. Santoni*, 585 F.2d 667, 671 (4th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459

(1979). It is clear, therefore, that the Hobbs Act is not limited to one-dimensional, wholly legitimate businesses. On the basis of these authorities, we hold that the Hobbs Act's coverage extends to mixed legal-illegal business ventures like that of Leo Dyer.

■ The defendants contend that even if the Act does extend to Dyer's business, the removal of $1000 from his roll of money could not interfere with interstate commerce. For Hobbs Act jurisdiction to exist, there must be a "nexus" between the alleged extortionate conduct and interstate commerce. *U. S. v. Elders*, 569 F.2d 1020, 1024 (7th Cir. 1978); *U. S. v. Craig*, 573 F.2d 513, 518 (7th Cir. 1978). This nexus may be established by proof of an actual impact on commerce, even if the impact is only "arguably *de minimus*," *U. S. v. Crowley*, 504 F.2d 992, 997 (7th Cir. 1974), or, in the absence of proof of an actual impact, by "showing a realistic probability that . . [the] extortionate transaction will have some effect on interstate commerce." *U. S. v. Staszcuk*, 517 F.2d 53, 60 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

The government relies on the "depletion of assets" theory to show the requisite impact on interstate commerce in this case. The theory is well established in this, as well as other, circuits. See, e. g., *U. S. v. Santoni*, 585 F.2d 667, 672 (4th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979); *U. S. v. Mazzei*, 521 F.2d 639, 642 (3d Cir.) (en banc), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *U. S. v. Gill*, 490 F.2d 233, 236–37 (7th Cir. 1973), *cert. denied*, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974); *U. S. v. DeMet*, 486 F.2d 816, 821 (7th Cir.

---

F.2d 233, 236 (7th Cir. 1973), *cert. denied*, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974).

**6.** *Government Trial Exhibit 8A.* Defendants point out that the indictments in this case described Dyer's establishment as the "G and J Tire Shop," a name which they claim has no foundation in the evidence. This observation is made in connection with defendants' argument that Dyer's establishment was not a tire shop at all. We do not understand them to argue that this variance, if indeed it is a variance, in any way rendered the indictments insufficient.

The difference in names, in this case, could not have misled the defendants or prejudiced them in their defense and thus could not amount to a fatal variance. See *U. S. v. Pile*, 256 F.2d 954, 957 (7th Cir. 1958).

**7.** Some evidence suggests that Dyer's sales of heroin averaged $1000 daily, or $365,000 annually. From this, defendants calculate that less than 1% of Dyer's 1976 gross income was attributable to legitimate business activities.

1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). According to the depletion of assets theory:

> [C]ommerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods.

*U. S. v. Elders*, 569 F.2d 1020, 1025 (7th Cir. 1978). The government's position is that the extortion depleted Dyer's assets by $1000, thereby reducing his ability to purchase tires in interstate commerce. Defendants argue that this position is untenable because: (1) the money taken from Dyer was the product of illicit operations and thus the extortion could have no impact on legitimate commerce; (2) the amount taken was too small to affect commerce; and (3) Dyer's shop did not "customarily purchase items in interstate commerce."

■ We find that the defendants' contentions are without merit. First, there is substantial evidence in the record that Dyer's shop contained no cash register or cash drawer, that Dyer commingled cash derived from his legal and illegal activities, and that he paid for new tires with cash. It is clear from this evidence that the removal of $1000 from Dyer's pocket could curtail his purchases of tires in interstate commerce. Second, this court, applying the depletion of assets theory, has found that payments much smaller than $1000 have at least a *de minimus* impact on interstate commerce. See, e. g., *U. S. v. Irali*, 503 F.2d 1295, 1297–98 (7th Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) ($150 payment); *U. S. v. Pacente*, 503 F.2d 543, 545 (7th Cir.), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 623, 42

L.Ed.2d 642 (1974) ($200 payment); *U. S. v. Gill*, 490 F.2d 233, 236–37 (7th Cir. 1973), *cert. denied*, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974) ($300 payment). Finally, the evidence that Dyer's tire business had been conducted since 1973 and that Dyer made at least five separate purchases of tires during the first ten months of 1976, is sufficient to show that he "customarily purchase[d] items in interstate commerce."[8] We find that the government sustained its burden of showing a nexus between the extortionate conduct and interstate commerce; therefore, Hobbs Act jurisdiction exists in this case.

### III

Defendants next object to the trial court's decision to admit into evidence statements made in the tire shop and recorded after the defendants' departure. The following statements are the subject of the objection:

> 2ND WOMAN: I bet they were gonna bribe you anyway.
>
> DYER: What'd you say?
>
> 2ND WOMAN: I bet you were gonna bribe them anyway so we wasn't worried about it (inaudible).
>
> \*   \*   \*   \*   \*   \*
>
> DYER: You see one piece they, they take one piece (inaudible) they take everything you got they take everything you got that stuff like tonight cost me a thousand dollars.

The defendants claim that these statements were a crucial element of the government's case and that their admission violated the rule against hearsay and the Sixth Amendment Confrontation Clause. The trial court admitted the statements as present sense impressions. Fed.R.Evid. 803(1).[9] We will

---

**8.** The fact that it was inevitable that Dyer's shop would be closed once the F.B.I. and the Chicago Police completed their investigation does not disturb this finding, despite this court's language in *Elders*. The factor which distinguishes this case from *Elders* is that Dyer did not, at the time of the extortion, *intend* to close his shop in the near future. Compare *U. S. v. Elders*, 569 F.2d 1020, 1024 (7th Cir. 1978)

with *U. S. v.Santoni*, 585 F.2d 667, 672 (4th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979).

**9.** Rule 803 of the Federal Rules of Evidence is entitled, "Hearsay Exceptions; Availability of Declarant Immaterial," and provides, in relevant part:

address first the defendants' hearsay objection and then their Confrontation Clause argument.

## A

■ Defendants raise two objections to the use of the present sense impression exception. First, they contend that the statements were not, as required by Rule 803(1), substantially contemporaneous with the event they describe. Second, there were no witnesses, other than Dyer and the three officers, to the relevant event—the exchange of $1000 in the rear of the shop. There is no explicit requirement in Rule 803(1) that a witness to the event be available for cross-examination; defendants, however, argue that such a requirement must be considered implicit in the present sense impression exception. See *Houston Oxygen Co. v. Davis,* 139 Tex. 1, 161 S.W.2d 474, 476–77 (1942); Advisory Committee Note to Rules 803(1) and (2), citing Morgan, *Basic Problems of Evidence* 340–41 (1962).

The latter contention need not detain us long. Although Dyer was alone with the three officers in the rear of the shop, there were several witnesses who could testify to all the events leading up to and following that brief meeting. The availability of these witnesses for cross-examination satisfies the *Houston Oxygen* requirement. It is not necessary that the witnesses be in the same position to observe as the declarant; it is only necessary that the witnesses be able to corroborate the declarant's statement. The witnesses in this case supplied substantial corroboration. We note also that the need for such witnesses is somewhat reduced where, due to tape recording, there is no uncertainty as to the content of the declarant's statement.

The defendants' argument that the time lapse between the event and Dyer's statement was too great to comply with Rule 803(1) is less easily resolved. The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication. There is no *per se* rule indicating what time interval is too long under Rule 803(1); however, several courts have found particular intervals to be too long under the circumstances of the cases before them. See, e. g., *U. S. v. Cain,* 587 F.2d 678, 681–82 (5th Cir.), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1543, 59 L.Ed.2d 793 (1979); *Hilyer v. Howat Concrete Co., Inc.,* 188 U.S.App.D.C. 180, 184 n.7, 578 F.2d 422, 426 n.7 (D.C. Cir. 1978); *U. S. v. Narciso,* 446 F.Supp. 252, 284–288 (E.D.Mich. 1977). Due to factual differences, neither *Cain* nor *Narciso* provides much guidance in this case. Defendants rely heavily on *Hilyer,* in which the District of Columbia Circuit indicated that a 15 to 45 minute interval is longer than contemplated by Rule 803(1). 188 U.S.App.D.C. at 184 n.7, 578 F.2d at 426 n.7. This statement was unnecessary to the decision in *Hilyer* since that case was resolved on the basis of the excited utterance exception, Fed.R.Evid. 803(2); nonetheless, it is suggestive of the standard to be applied here. We note, however, that the admissibility of statements under hearsay exceptions depends upon the facts of the particular case. *Chestnut v. Ford Motor Co.,* 445 F.2d 967, 973 (4th Cir. 1971).

It is difficult, from the record before us, to determine precisely the interval between the event of extortion and Dyer's statement.[10] It is undisputed that the officers left the shop at 6:00 p. m. The statements at issue were recorded after the officers'

---

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

**10.** Part of the difficulty is generated by defendants' argument that the interval should be

measured from the time the officers and Dyer emerged from the rear of the shop, rather than from the officers' departure from the shop. The officers' departure from the shop is the relevant measurement point; it is clear that the event of extortion did not end until that point and that Dyer would not have made any statements describing what transpired in the rear of the shop until after the officers left.

departure and prior to a telephone conversation which occurred at 6:23 p. m. *Government Trial Exhibit A–2.* It is clear, therefore, that Dyer's statements were made between several minutes and 23 minutes after the defendants left the shop. A relatively large amount of conversation was recorded, according to the transcript of the tape, between Dyer's statements and the 6:23 p. m. telephone call; the transcript thus would support a finding that Dyer's statements were made soon after defendants' departure.[11] *Defendants' Abstract and Excerpts of Record* at 226–32. The trial court was justified in finding that the time interval was not so great as to render Rule 803(1) inapplicable to Dyer's statements. This finding, coupled with the substantial circumstantial evidence corroborating the statements' accuracy, indicate that the trial court acted properly in admitting these statements. See Fed.R.Evid. 104(a).

### B

■■ The fact that a statement is admissible under an exception to the hearsay rule does not necessarily indicate that admission of the statement will not violate a defendant's Sixth Amendment right to confront the witnesses against him. *California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *U. S. v. Cogwell,* 486 F.2d 823, 832–33 n.5 (7th Cir. 1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974).[12] This court employs a two-part test, derived from *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), to determine whether statements admitted pursuant to a hearsay

exception violate the confrontation rights of a defendant. *Cogwell, supra,* 486 F.2d at 834. First, it must be clear that the declarant actually made the statement in question. Second, there must be circumstantial evidence supporting the truth of the statement. *Id.*

■ Both of these requirements are satisfied in this case. The tape recording prevents any doubt as to whether Dyer made the statements in question. In addition, there is substantial circumstantial evidence supporting the truth of Dyer's statement that he paid the officers $1000. There were a number of witnesses to the officers' visit to the shop, all of whom were available for cross-examination; it is undisputed that the defendants were at the shop on July 31, 1976, outside their districts, without a valid search warrant; and other recorded conversations, including statements by the defendants, corroborate Dyer's statement that a payoff had been made. The fact that Dyer's statements may have been damaging to defendants' case does not change the inquiry; in light of the other substantial evidence, Dyer's statements were far from "crucial or devastating." *Cogwell, supra,* 486 F.2d at 834.

The other factors mentioned in *Cogwell* also point to admissibility in this case: Dyer's statements were not coerced or made in a custodial situation; there was no prosecutorial misconduct involved in the procuring of the statements or the unavailability of Dyer at trial; and the defendants had the opportunity to cross-examine all of the other witnesses to the officers' visit.[13]

---

**11.** The reason for the uncertainty as to the precise time involved is evidence that the tape was stopped several times so that the recording was not necessarily continuous. Had the recording been continuous, it presumably would be a relatively simple matter to measure the interval between the officers' departure and Dyer's statements.

**12.** Several recent cases, however, have suggested that the hearsay exceptions as codified in the Federal Rules of Evidence satisfy the requirements of the Confrontation Clause. See, e. g., *U. S. v. West,* 574 F.2d 1131, 1137–38 (4th Cir. 1978); *U. S. v. Medico,* 557 F.2d 309, 314 n.4 (2d Cir.), *cert. denied,* 434 U.S. 986, 98

S.Ct. 614, 54 L.Ed.2d 480 (1977). See also *U. S. v. Oates,* 560 F.2d 45, 78–80 (2d Cir. 1977).

**13.** The record reveals that the defendants presented extensive evidence designed to undercut the statements' reliability in the eyes of the jury. This evidence ranged from the details of the criminal backgrounds of Dyer and the other witnesses to other statements by Dyer inconsistent with the one now before us. Dyer's unavailability for cross-examination did not appreciably hinder defendants' efforts to minimize the weight given to his statement by the jury. See *U. S. v. Adams,* 446 F.2d 681, 683–84 (9th Cir.), *cert. denied,* 404 U.S. 948, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971).

*Id.* In light of all of the circumstances of this case, it cannot be said that defendants' inability to cross-examine Dyer "deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration." *U. S. v. Adams*, 446 F.2d 681, 683 (9th Cir.), *cert. denied*, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971). We hold, therefore, that the trial court's decision to admit Dyer's recorded statements did not deny defendants their Sixth Amendment right of confrontation.

## IV

The defendants object to the trial court's handling of the hearings on the admissibility of the tape recording held at the close of the evidence and after the verdict. The trial judge initially found the tape admissible and it was played for the jury, over defendants' objection. At the close of the evidence, the defendants renewed their attack on the tape, alleging that conversations supporting their theory of defense had been deleted from the tape. The allegation was based on evidence that the tape was not a continuous recording of all sounds occurring in Dyer's shop; this evidence, although not disputed by the government, contradicted the testimony of the F.B.I. agent who had operated the tape recorder. The trial judge allowed the defendants to recall several witnesses out of the jury's presence. This hearing revealed no significant evidence substantially different from that already presented to the jury.

▓▓▓▓▓ Initially, it must be noted that the government had the burden of showing, by clear and convincing evidence, that the tape was authentic and accurate before it could be played for the jury. *U. S. v. Fuentes*, 563 F.2d 527, 532 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *U. S. v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977). The trial judge has broad discretion to determine whether this burden has been satisfied; this determination will not be upset on appeal absent extraordinary circumstances. *Biggins, supra,* 551 F.2d at 66–67.[14] The trial judge in this case was well within his discretion in admitting the tape. The government established the tape's foundation by evidence of chain of custody and by the correspondence between the tape's version of the events inside the shop and the recollections of eyewitnesses to those events; in this circuit, either variety of evidence can establish a tape's foundation. *U. S. v. Craig*, 573 F.2d 455, 478–79 (7th Cir. 1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 110 (1978). Once this foundation was established, the defendants had the burden of rebutting it at the hearings on admissibility. *U. S. v. De La Fuente*, 548 F.2d 528, 533–534 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249; 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977).

The defendants failed to meet this burden at either hearing. The Fifth Circuit's remarks in *De La Fuente* are particularly appropriate in this case:

> [W]e have not found a single case holding that a defendant can prevail at a suppression hearing by simply conjecturing that the government *might* have acted illegally. . . . [G]eneral, conclusory allegations based upon mere suspicions do not entitle a defendant to have evidence suppressed.

548 F.2d at 534 (emphasis in original). Defendants' argument that the tape was selectively edited was little more than a "general, conclusory allegation based upon mere suspicions." In the absence of any likelihood that the tape had been tampered with, the trial judge was justified in refusing to recall, for examination at the pre-verdict

---

14. The Fifth Circuit's language in *Biggins* reveals that the trial judge's discretion in these matters is broad indeed:

> If the trial judge independently determines that the recording accurately reproduces the auditory evidence, . . . his discretion to admit the evidence is not to be sacrificed to a formalistic adherence to the standard we establish. If there is independent evidence of the accuracy of the tape recordings admitted at trial, we shall be extremely reluctant to disturb the trial court's decision even though at the time that decision was made the government had not carried its particularized burden of going forward.

*U. S. v. Biggins*, 551 F.2d 64, 67 (5th Cir. 1977).

hearing, the F.B.I. agent who operated the tape recorder. *U. S. v. Fuentes*, 563 F.2d 527, 532 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977). The jury had before it all the evidence necessary to evaluate the weight to be given the tape. See *Id.* at 532.

■ The trial judge also conducted a post-verdict hearing to determine, through expert examination, whether the tape played to the jury was an original or a re-recording. The defendants object to the judge's refusal to grant a continuance necessary to afford their expert ample time to test the tape.[15] It cannot be said that the trial judge's action amounted to an abuse of discretion or a denial of due process. The testimony of defendants' own expert and the reports of the court-appointed expert indicated that the testing proposed by defendants was likely to be of little or no utility in resolving the issue of the tape's integrity. It is not an abuse of discretion to deny a request for a continuance where a defendant's attack on a tape's admissibility is without foundation. See *U. S. v. Mendoza*, 574 F.2d 1373, 1378–79 (5th Cir.), *cert. denied*, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978).

The defendants raise several other objections in connection with the two hearings. We have carefully considered their contentions and find them to be without merit.

### V

■ As the final grounds for reversal, defendants assert that the prosecutor, during closing argument, argued matters not in evidence and that the trial judge improperly reprimanded defense counsel in the presence of the jury. As to the first claim, both statements said to be unsupported by the evidence were in fact based on evidence before the jury and represented reasonable inferences from that evidence. In addition,

one of the statements was supported by testimony adduced at the pre-verdict hearing; defense counsel had agreed to a stipulation that evidence presented at the hearing could be raised in argument before the jury. Neither statement, therefore, presents any basis for reversal of defendants' convictions.

As a result of defense counsel's objections during the prosecutor's closing argument, the trial judge directed the following remark toward defense counsel, in the presence of the jury:

> I would suggest, Mr. Montgomery, that your interruptions of Mr. Johnson are more numerous than I think ideal. You talked for over two hours and he didn't interrupt you once.

Defendants argue that this remark so discredited their counsel in the eyes of the jury that it amounted to a denial of effective assistance of counsel. Defendants properly cite *U. S. v. Spears*, 558 F.2d 1296 (7th Cir. 1977), as indicating that this court will reverse a criminal conviction where a trial judge's remarks to counsel effectively destroy his credibility in the eyes of the jury. Comparison of the facts in *Spears* with the statement quoted above reveals, however, that no such judicial impropriety occurred in this case. The statement above did not suggest to the jury that defense counsel was not worthy of their belief; it revealed no more than the judge's concern with the orderly progression of the trial. The statement could not have discredited counsel before the jury and therefore did not rise to the level of impropriety condemned in *Spears*.

Having fully considered all of defendants' arguments in this case and finding all without merit, we affirm the jury convictions of the defendants.

Affirmed.

---

**15.** At this point in the hearing, the court had already had the benefit of detailed reports from a court-appointed tape expert. This expert concluded that further testing, including the method proposed by defendants' expert, could shed no more light on the originality of the tape. Defendants' expert, although he never abandoned his opinion that his method of testing was valid, did concede that the particular circumstances under which the tape had been made added a great deal of uncertainty to his testing procedure. *Transcript of Proceedings*, December 4, 1978, at 119–25.