Charles Joseph **BATTAGLIA**, Jr.,
Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 21784.

United States Court of Appeals
Ninth Circuit.

Oct. 4, 1967.

Albert J. Krieger, Robert Kasanof, New York City, for appellant.

Joseph Corey, Sp. Atty., Dept. of Justice, Washington, D. C., Edward E. Davis, U. S. Atty., Tucson, Ariz., for appellee.

Before MADDEN, Judge of the United States Court of Claims, and MERRILL and KOELSCH, Circuit Judges.

MADDEN, Judge:

Battaglia, who will be hereinafter sometimes referred to as the defendant, appeals from his conviction on January 20, 1967, of a violation of § 1951 of Title 18, United States Code, the statute known as the Hobbs Act.[1] He had been indicted, together with Spinelli and Estes, on March 5, 1965, on a charge of having interfered with interstate commerce by having, by threats, obtained from one Greenwell space in a bowling alley operated by Greenwell for a coin-operated pool table and a share of the profits from its operation. Spinelli and Estes were tried separately from Battaglia and were acquitted on December 9, 1965. Battaglia obtained five continuances on account of illness. His trial began on January 19, 1967, and he was convicted on January 20.

Battaglia's enterprise, Tucson Vending Co., was engaged in placing vending machines, pinball machines and other such equipment in places such as bowling alleys under arrangements with proprietors to share the profits from the machines. In June, 1963, such an arrangement between Battaglia and Greenwell was initiated. Some machines were installed and proved profitable. Battaglia agreed with Greenwell that he would indemnify Greenwell against any liability of Greenwell to another company, Canteen, with which Greenwell had a contract about a cigarette vending machine, and Greenwell then agreed to let Battaglia install additional machines, but refused to sign an exclusive contract with Battaglia until the expiration of the Canteen contract.

One Gumbin was the lessee from Greenwell of the cocktail lounge in the premises of Greenwell's bowling alley. A coin-operated pool table in Gumbin's cocktail lounge had proved profitable, and Greenwell and Gumbin agreed, in December, 1963, to place another such pool table in the bowling alley, and the table was obtained from a source other than Battaglia's company. A few days later, Battaglia angrily complained to Greenwell that he and Greenwell had an agreement that such machines would be obtained only from Battaglia. Greenwell denied that there was such an agreement. Battaglia reminded Greenwell what had happened to one Serota. They both knew that he had been murdered and his body had been found in the trunk of his automobile. Battaglia said, "You have a very attractive wife. I know which way she goes home, and I'm sure you don't want anything to happen to her, and you don't want anything to happen to your factory."

The argument quieted down. Battaglia offered to buy the offending pool table from Gumbin, Gumbin refused to sell it. Soon thereafter, in the night, the felt on the pool table was slashed. Greenwell telephoned Battaglia and accused Spinelli and Estes, Battaglia's men, of having slashed the table. Battaglia answered, "If you think the slashing of the cover is so bad, how would you like to have a bowling ball through the slate?" The effect of such an oc-

---

1. The parts of § 1951 pertinent to this case are:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

currence would be serious and almost irreparable damage to a pool table.

Greenwell told Gumbin to remove the pool table from the bowling alley. He replaced it with a table obtained from Battaglia's company.

The parties stipulated that both the pool table which was removed from Greenwell's bowling alley and the table supplied by Battaglia, which replaced it, had been shipped to Tucson, Arizona, from outside that state.

## I

## THE INTERSTATE COMMERCE QUESTION

■ Battaglia's appeal asserts a failure of proof that there was an obstruction or an effect upon interstate commerce as required by the Hobbs Act. Chief Justice Marshall, in Gibbons v. Ogden, 22 U.S. 1, 9 Wheat. 1, 6 L.Ed. 23 (1824), said of the Commerce Power vested in Congress by the Constitution:

> "This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than those prescribed in the Constitution."

In spite of this expansive language of the Chief Justice in Gibbons v. Ogden, the extent of the power of Congress under the commerce clause was extensively litigated and remained unclear until the 1937 decision of the Supreme Court in the case of National Labor Relations Board v. Jones and Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893. The opinion of Chief Justice Hughes in that case validated the power of Congress to regulate any activity which affected interstate commerce. Two years later, in the case of National Labor Relations Board v. Fainblatt, 306 U.S. 601, 607, 59 S.Ct. 668, 672, 83 L.Ed. 1014, Mr. Justice Stone, in answering Fainblatt's argument that

Congress could not regulate activities which had only a small effect on interstate commerce, wrote:

> "Examining the Act in the light of its purpose and of the circumstances in which it may be applied, we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which the courts would apply the maxim de minimis."

Since the rendition of the foregoing decisions the only question left for litigation has been, not the question of the constitutional power of Congress, but the question of the intent of Congress to include, or not to include, within the reach of a statute the kind of activity involved in the litigation. In United States v. Stirone, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252, the Court said that the Hobbs Act speaks in "broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree.'"

The defendant urges that, although the pool table here involved which his alleged extortion caused to be removed from use at Greenwell's bowling alley had been shipped in interstate commerce to a dealer in Tucson before it was acquired and installed by Greenwell in his bowling alley, its interstate journey and ended before it was acquired by Greenwell, and therefore later events relating to it did not affect interstate commerce. In National Labor Relations Board v. Reliance Fuel Oil Corp., 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279, the Court held to the contrary as to the Labor Relations Act.[2] In United States v. Stirone, 168 F.Supp. 490, 496, the Court said:

> "* * * a deliberate act which tends to prevent articles from being used once they have reached their

2. See Wickard v. Filburn, 317 U.S. 111, 124, 63 S.Ct. 82, 87 L.Ed. 122, to the effect that earlier doctrine requiring that the economic effect of conduct on interstate commerce must be direct in order to bring the conduct within the Commerce Power of Congress is no longer valid.

destination after being shipped in interstate commerce dams up the stream of commerce and delays, obstructs and affects interstate commerce as surely as though the same act had cut off the supply at its source."

We find no error in the district court's interpretation of the Hobbs Act or its application to the facts of this case.

## II

### THE CROSS-EXAMINATION OF MRS. GREENWELL

Mrs. Greenwell was a witness for the prosecution, who by her testimony supported her husband's testimony that he had requested her to drive home after work by a better lighted, though longer, route than she had been using, and to telephone him when she started home; that upon her insistence on knowing the reasons for those requests, he had told her of the defendant's threatening statement about her. The defendant on cross-examination questioned her about her going alone to a dog track and to dances. When the court questioned the materiality of the subject of these questions, counsel said in effect that further questioning might tend to show that Greenwell was moved by jealousy, rather than by fear for his wife resulting from the defendant's threats. The court indicated that it thought the questions were irrelevant, but expressly gave counsel permission to pursue the line of questioning. Counsel then examined about other matters, then returned to the subjects of the dog track and dances, asking the witness whether during the period January, 1964, to April, 1964, she went to the dog track or went dancing. It will be remembered that the trial took place in April, 1967. The witness answered that she did not remember whether she had or had not gone to the dog track or gone dancing during that period.

■ We see nothing in the defendant's complaint that he was improperly restricted in his cross-examination of Mrs. Greenwell. He was given express permission to pursue the inquiry, and did so. His further questions produced no answers which made further cross-examination promising for him, and he dropped the subject. He urges in his brief that he "quite reasonably * * * in view of the court's evident hostility to the line of questioning, moved to something else rather than risk the ire of the trier of fact." But, having moved to something else, he later made use of the express permission which the court had given him and returned to the same line of cross-examination and, so far as the record shows, exhausted it. In effect he is now urging that once a trial judge has erroneously indicated that he thinks a line of questioning is irrelevant, he has committed reversible and incurable error, even though he immediately thereafter changes his ruling and the line of questioning is followed, without interruption, to its end. We are not willing to adopt such a wasteful and improvident rule.

## III

### THE ELECTRONIC SURVEILLANCE PROBLEM

On January 11, 1967, eight days before the trial began, a Department of Justice attorney disclosed to the court and to counsel for the defense that extensive electronic surveillance of the defendant had been carried on by the department. The defendant made a motion to suppress the Government's evidence, and the court set January 16 as the date for a hearing on the motion. At that hearing government counsel stated the dates and places at which electronic surveillance, by means of microphones installed by trespass and involving Battaglia, had been carried on. All of the logs of the conversations in which Battaglia was a participant, or in which he was mentioned in conversations, were given to the court and to counsel for the defense. The logs consisted of notes made by government agents who listened to the conversations picked up by the secret microphones and transmitted by radio waves to receiving

devices installed in the government headquarters, where agents listened to them and made notes of what they regarded as significant. Several attempts were made to record on tape what came to the receiving sets, but because of mechanical failures no intelligible tapes were obtained.

At the hearing on the motion to suppress evidence, defense counsel argued that "* * * at the very least, the Government should proceed to show that its lawlessness has not infected this indictment"; "* * * they must show an independent train of evidence bringing about this indictment"; "the Government must prove an independent source of its case. This is the burden the Government has put upon itself by violating the law." The inference from the above quoted statements of defense counsel is that if the Government could persuade the court that what the Government had learned by its extensive surveillance of Battaglia had no connection with the obtaining of the indictment for extortion against Battaglia, and produced no leads to the evidence which would be used at his trial, there would be nothing to suppress.

The Government produced the F.B.I. agent, Fauver, who testified as to how the case against Battaglia originated and was developed. He testified that in April, 1964, he was assigned to the investigation as a result of Greenwell's having told the Tucson Police Department, in March, 1964, of Battaglia's conduct and threats. Fauver interviewed Greenwell. Greenwell told him of Chapman and Bierschbach, who had information about the pertinent events. Chapman told Fauver about Gumbin and McCormick. Testimony at the grand jury investigation caused the Government's special prosecutor, Mr. Corey, to direct Fauver to interview four other potential witnesses. On his own initiative he interviewed one other person, because that person's establishment had been bombed. The Government thus accounted for the origin and development of the case which it intended to present at Battaglia's trial. Defense counsel, at the suppression hearing, cross-examined the Government's witnesses in an effort to induce the court not to believe them. His examination of the logs, which had been in his possession for several days, discovered nothing which connected the prosecution of Battaglia for extortion with the surveillance. He argued, and in his brief argues, that testimony of certain government witnesses as to the absence of any connection between the trespassory surveillance and the case against Battaglia was so implausible as to be unbelievable. But the court believed the testimony and that was within its province as the trier of fact.

The defendant argues that included in the extensive surveillance of his conversations were conversations with a Mr. Soble who was, at the time of the surveillances, his legal counsel. These surveillances were voluntarily disclosed by the Government. The Government's witnesses, credited by the court, and the logs of what was overheard show an absence of any connection between what was overheard and the indictment and the trial of Battaglia. Surveillance of a conversation between a lawyer and his client may be a particularly obnoxious type of surveillance, but it still may have nothing to do with the case on trial.

■ The defendant urged the trial court and urges this court to decide that when there has been illegal surveillance by the Government, or at least when that surveillance has been as extensive as it was in this case, "only a flat bar to prosecution will be an effective deterrent and an adequate vindication of the defendant's rights against electronic bugging." We are urged to be the first to decide that if the constable's blunder[3] is electronic surveillance, the criminal is, *ipso facto* and irretrievably, to go free. The Court said, in Mapp v. State of Ohio, 367 U.S. 643,

---

3. See Cardozo, J., in People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585 (1926).

653, 81 S.Ct. 1684, 1690, 6 L.Ed.2d 1081, " * * * time has set its face against what Wolf[4] called the 'weighty testimony' of People v. Defore [1926, 242 N.Y. 13, 150 N.E. 585] * * * " But in all the situations in which criminal convictions have been reversed because of conduct of the prosecuting authority in violation of a constitutional right of the defendant, the reversal left the prosecution free to retry the defendant, omitting the tainted evidence and its fruits, or the forbidden conduct. See, e. g., Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975, coerced confession; Mapp v. State of Ohio, supra, illegal search; Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, compulsion of self-incrimination by comment on failure of defendant to testify. Although the practical result of the reversal may in many cases be that the defendant will not be retried because of a lack of untainted evidence, the fact of the tainted conduct does not, of itself, bestow immunity upon the defendant. Under the doctrine urged by the defendant for application to this electronic surveillance case, there would be nothing which could be omitted or done differently in the second trial. Since the surveillance obtained no evidence and produced no fruits, the second trial would be as vulnerable as the first to a motion to dismiss. We can think of no reason why this violation by the prosecution of a defendant's constitutional rights should be singled out for uniquely drastic treatment.

We therefore reject the defendant's proposed doctrine that extensive trespassory surveillance requires dismissal of a prosecution, even though there is no connection between the surveillance and the indictment and trial.

■ We return now to the consideration of the question whether the trial court's conclusion that there was, in fact, no connection between the surveillance and the indictment and trial is supportable. We do not find it necessary to resolve the mooted question as to where the burden lies to prove that there was, or was not, some connection. We assume that the burden was upon the Government to prove lack of such connection. The Government undertook systematically to make that proof. Its witnesses testified that in the preparation of the case they made no use of what had been learned by the illegal surveillance. They presented the logs, which contained nothing that would have been of use in this extortion case. They testified as to how and when and from whom they had obtained their evidence. This was live testimony, subject to cross-examination by the defendant, given by reputable witnesses, and in no sense implausible in its content. The trial court believed the testimony. The testimony of the witnesses, at the trial, to the defendant's threats and their effects upon Greenwell, and to events circumstantially involving the defendant, gave no indication whatever that the testimony had any relation to the electronic surveillance. If that condition of the evidence does not justify the court's conclusion, at the suppression hearing, that the trial would not be tainted by the surveillance, then we are back to the defendant's contention, which we have rejected, that the surveillance *ipso facto* would taint the trial and thus compel dismissal.

■ We find the proof of extortion adequate.

The defendant asserts other alleged errors. We have considered these assertions and do not find the points involved substantial.

The judgment is affirmed.

4. Wolf v. People of State of Colorado, 338 U.S. 25, 31, 69 S.Ct. 1359, 93 L.Ed. 1782.