UNITED STATES of America, Plaintiff,

v.

Ronald E. BLAIR, Defendant.

No. CR–90–0377 MHP.

United States District Court,
N.D. California.

April 25, 1991.

George L. Bevan, Jr., Asst. U.S. Atty., Organized Crime Strike Force, San Francisco, Cal., for plaintiff.

Patrick Sarsfield Hallinan, Hugh Anthony Levine, Hallinan, Poplack & Levine, San Francisco, Cal., for defendant.

## OPINION

PATEL, District Judge.

Defendant Ronald E. Blair ("Blair") is charged, *inter alia*, with one count of violating the Hobbs Act, 18 U.S.C. § 1951, in that Blair allegedly "did knowingly and

intentionally obstruct and attempt to obstruct ... and affect commerce by extortion ... in that defendant obtained cash ... and other property from ... Raymond Vyeda ... under color of official right." Superseding Indictment ("Indictment") at 2. This count was severed from the remaining counts and prosecuted in a separate bench trial.

Having evaluated the evidence presented at trial, the court finds that the necessary element of obstructing and affecting interstate commerce has not been proved beyond a reasonable doubt. The court therefore finds defendant Blair not guilty on Count One.

The court sets forth below its findings of fact and conclusions of law. To the extent that any findings are included in the conclusions or endnotes they are deemed findings of fact.

FINDINGS OF FACT

1. During 1985, Blair was employed as a deputy district attorney by the Alameda County District Attorney's office in California.

2. On June 27, 1985, Raymond Vyeda ("Vyeda"), a social and business acquaintance of Blair's, was arrested in Alameda County for possession of illegal fireworks without a license. A criminal complaint was filed against Vyeda by the Alameda County District Attorney's office.

3. Shortly after his arrest and prior to his first scheduled court appearance, Vyeda contacted Blair seeking a recommendation for a defense attorney. In the course of this and subsequent conversations, Blair discouraged Vyeda from retaining an attorney. Blair instead suggested that if Vyeda provided him with $25,000, Blair would be able to make Vyeda's fireworks charge "go away."

4. Blair was not the prosecutor assigned to Vyeda's case; Blair was working in the juvenile division of the District Attorney's office at all relevant times.

5. Vyeda agreed to Blair's proposal, and after negotiating about the amount, Vyeda eventually delivered between $12,000–$13,000 in cash to Blair, to be used by Blair to make Vyeda's case "go away." Vyeda also gave Blair four cases of liquor as part of the payment.

6. Contrary to Vyeda's expectation that Blair would funnel the money to a judge with influence over Vyeda's case, in fact Blair retained the money for his own use.

7. Although Blair kept Vyeda's money, he did work to get Vyeda's case dismissed. Blair obtained five continuances for Vyeda, the last on October 18, 1985, thereby delaying his first appearance on the fireworks case. Blair accomplished this by telephoning the assigned municipal judge's courtroom deputy, identifying himself as a deputy district attorney, and falsely stating that Vyeda needed a continuance for medical reasons. Though all five continuances were granted, the case was not dismissed.

8. In addition, on October 21, 1985, Blair met with the fire chief and a captain of the Eden Fire District, the relevant fire department in Vyeda's fireworks charge, and offered to have Vyeda make a $5,000 donation to the fire district's nonexistent "widows and orphans" fund if Vyeda's case were dismissed. The fire chief firmly rejected Blair's proffered "donation."

9. Finally, on November 1, 1985, Blair approached Judge Goodman, the municipal judge assigned to Vyeda's case, in chambers and asked him to dismiss Vyeda's case. Judge Goodman denied Blair's request and immediately notified the District Attorney's office, which initiated investigative proceedings resulting in Blair's termination. Blair did not attempt to bribe Judge Goodman and Judge Goodman never received any of Vyeda's cash or liquor.

10. Vyeda obtained the money given to Blair by withdrawing approximately $11,000 from a personal money market fund at Bank of the West and making up the difference out of pocket cash.

11. Vyeda claimed that he purchased the four cases of liquor at Liquor Barn.[1]

---

**1.** The court finds this testimony is not credible for the reasons set forth in note 9, *infra,* but

nonetheless deals below with the fallacy of us-

12. At all relevant times, Vyeda was the sole proprietor of a small electrical contracting business, Anchor Electric. Vyeda also had some "cottage industry" side activities, including collecting antiques and memorabilia and selling fireworks. It was Vyeda's possession of the latter that led to his arrest.

## CONCLUSIONS OF LAW

### A. *Hobbs Act Violation*

The Hobbs Act provides for the criminal punishment of persons who interfere with commerce by the use of threats or violence. 18 U.S.C. § 1951.[2]

The government must prove four elements beyond a reasonable doubt to establish that Blair violated the Hobbs Act. These are:

a) that Blair was a Deputy District Attorney for Alameda County;

b) that Blair caused or attempted to cause Vyeda to part with either/both money and property by inducing Vyeda under color of official right;[3]

c) that Blair acted with the intent to obtain either/both money and property that Blair knew he was not entitled to receive; and,

d) that commerce, as defined in 18 U.S.C. § 1951(b)(3) (hereinafter termed "interstate commerce"), or the movement of an article or commodity in commerce was obstructed, delayed or affected in any way or degree by the extortion.

18 U.S.C. § 1951; *see also* Manual of Model Criminal Jury Instructions for the Ninth Circuit, section 8.31B (1989 ed.) (Hobbs Act—Extortion Or Attempted Extortion Under Color Of Official Right").

The court finds that the government has proved the first and third elements beyond a reasonable doubt. There is no question that Blair was a Deputy District Attorney for Alameda County during the relevant period. The evidence also conclusively demonstrates that Blair acted knowingly and intentionally in executing his extortion scheme, and also that he knew he was not

---

ing this evidence to provide an interstate commerce nexus.

**2.** 18 U.S.C. § 1951, *"Interference with commerce by threats or violence,"* provides in relevant part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section

. . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

**3.** The superseding indictment is not ideally clear. Count One of the superseding indictment charges both extortion and attempted extortion,

i.e., that Blair "did knowingly and intentionally obstruct and attempt to obstruct . . . by extortion . . . in that defendant obtained cash of approximately $12,000 from [Vyeda]." Indictment at 2. Actual extortion and attempted extortion are separate offenses under the Hobbs Act. If a separate and discrete attempted extortion was present, then this should have been charged in a separate count. *See United States v. Starks,* 515 F.2d 112, 116–118 (3rd Cir.1975), *later appeal, Appeal of Abney,* 530 F.2d 963 (3rd Cir.1976), *aff'd in part rev'd in part, Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (in a Hobbs Act prosecution, charges of conspiracy and attempt could not properly be included in the same count since they are separate offenses under the statute).

In this case, however, the alleged attempt was simply a lesser included portion of the alleged completed extortion; the superseding indictment speaks only of the actual extortionate acts, i.e., "in that the defendant obtained cash of approximately $12,000," and not the attempted extortion. The indictment, though artlessly drafted, is nevertheless sufficient under Federal Rule of Criminal Procedure 31(c), which provides that a defendant may be found guilty of an attempt to commit the substantive offense charged if the attempt itself is also an offense.

The requisite element of effect on interstate commerce is equally lacking for the lesser included charge of attempted extortion.

entitled to receive either the money or the liquor which Vyeda gave him.

■ The court finds that the second element, that extortion be induced "under color of official right," is also proved beyond a reasonable doubt, though not in the manner alleged in the superseding indictment. The evidence shows that Blair did induce Vyeda to part with cash and liquor under "color of official right"; but this inducement was *not* performed while Blair was "representing the People of California *in said criminal proceeding* [i.e., Vyeda's] as a Deputy District Attorney." Indictment at 2 (emphasis added). Instead, Blair accomplished the inducement through wrongfully peddling his general influence as *a* Deputy District Attorney, albeit one assigned to the juvenile division and not to Vyeda's case.[4]

B. *No Effect On Interstate Commerce*

The government's case fails to satisfy the fourth element, which requires that the extortion affected interstate commerce or the movement of any article in interstate commerce. An examination of the evidence produced in this case shows that the Blair/Vyeda transaction was a purely local (non-interstate) extortion of an individual victim whose personal business did not involve interstate transactions. In none of the Ninth Circuit Hobbs Act cases finding an effect on interstate commerce has the alleged nexus between the extortion and interstate commerce been as attenuated and strained as in this case. Furthermore, other circuit courts have found the requisite interstate commerce nexus to be *lacking* on facts even more suggestive of an interstate connection than in this extortion.

The government advances three theories under which the Vyeda extortion affected interstate commerce. First, under the depletion of assets theory, the extortionate payment of approximately $12,000 from Vyeda to Blair reduced Vyeda's available personal funds. The government argues that Vyeda could have used these reduced funds, as the self-employed sole proprietor of Anchor Electric, to purchase electrical supplies from San Leandro Electrical Supply ("SLE"), a business engaged in interstate commerce. Thus Vyeda's extortion payment allegedly affects interstate commerce, through SLE, by ultimately reduc-

---

**4.** It is not a straightforward conclusion that Blair induced Vyeda "under color of official right," due to the government's having misalleged Blair's capacity in relationship to Vyeda's case. The superseding indictment alleges that Blair induced Vyeda "under color of official right, to wit, while representing the People of California in said criminal proceeding [*People v. Raymond Vyeda,* No. 196220, filed in Alameda County Municipal Court] as a Deputy District Attorney...." Indictment at 2. This is simply untrue since Blair *never* was assigned to Vyeda's case in any capacity and therefore never "represented" the State in that proceeding. Instead, at all relevant times, Blair worked in the juvenile division of the District Attorney's office. Furthermore, Vyeda *knew* that Blair worked in the juvenile division and therefore that he was not and would not be assigned to prosecute Vyeda's case. Consequently, it is not clear-cut that Blair induced Vyeda under color of official right.

Nevertheless, the indictment may be deemed sufficient to have put defendant on notice regarding this element, though not in the manner related in the superseding indictment. The evidence adduced at trial shows that Blair misused the power of his public office in such a way as to induce Vyeda to give him benefits. This was because Vyeda reasonably believed that Blair's position in the District Attorney's office—though not as the prosecutor assigned to his case—would enable Blair to successfully pass a bribe to a judge who could influence the disposition of Vyeda's case. This construction of the extortion accurately places Blair's actions "under color of official right." *See United States v. Blackwood,* 768 F.2d 131, 138 (7th Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985) (victim could have reasonably believed that police officer's position in traffic court unit of city police department enabled him to keep his promise to influence judicial decisions by passing bribes on to judges in traffic court, such that officer's extortion was "under color of official right" for purposes of Hobbs Act prosecution); *see also Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590, *reh'g denied,* 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974) ("an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense").

The court therefore finds that Blair induced Vyeda under color of official right through wrongfully peddling his general influence as a District Attorney.

ing the amount of funds expended on the interstate purchase of electrical supplies.

The government also extends the depletion of assets theory to Vyeda's fireworks and memorabilia sidelines, contending that his purchases of these items would also be constrained by his having funneled money to the extortion payment.[5]

Second, the government alleges that Vyeda's purchase of one case of "scotch" from Liquor Barn, as part of the extortionate transfer of four cases of liquor, had some effect on interstate commerce.[6]

Third, the government contends that Vyeda's mere withdrawal of money from his account at Bank of the West to pay Blair in itself provides the necessary link to interstate commerce.

All three contentions must be rejected.

1. Legal Standard

■ In extending federal jurisdiction over extortionate acts covered by the Hobbs Act, Congress manifested a purpose "to use all the constitutional power Congress has to punish interference with interstate commerce by extortion...." *United*

States v. Bagnariol, 665 F.2d 877, 894 (9th Cir.1981) (per curiam), *cert. denied sub nom. Gallagher v. United States*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982) (quoting *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960)). As a result, "[t]he Hobbs Act definition of commerce is coextensive with the constitutional definition." *United States v. Hanigan*, 681 F.2d 1127, 1130 (9th Cir.1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983). Yet even this broad mandate does not relieve the government of the burden of demonstrating that interstate commerce was indeed affected by Blair's extortionate act. This nexus between the extortion and interstate commerce may be de minimis, *Battaglia v. United States*, 383 F.2d 303, 305 (9th Cir.1967), *cert. denied*, 390 U.S. 907, 88 S.Ct. 817, 19 L.Ed.2d 874 (1968), but it must nonetheless exist. *United States v. Elders*, 569 F.2d 1020, 1024 (7th Cir.1978). An examination of the facts of this case shows that no such nexus is present.

2. Depletion of Assets

■ Briefly stated, the depletion of assets theory holds that "[w]here the victim

---

**5.** Vyeda apparently had many small side ventures, in addition to his main employment as an electrical contractor, which the government dignifies as "businesses." These sidelines included: collecting "Disneyana" (memorabilia of Walt Disney and Disneyland); collecting John F. Kennedy memorabilia; collecting stamps and coins; being in the "flea market business"; collecting liquor and selling softdrinks. These sidelines uniformly appear to have been sporadic activities, and the actual volumes, dimensions, consistencies and durations of these activities remain uncertain.

Vyeda's fireworks sideline illustrates this vagueness. Vyeda testified that he got into the fireworks sideline "maybe 15 years ago" but then admitted that he did not sell fireworks every year, and in the years he did sell fireworks it was only seasonally. Vyeda Transcript at 5–6. Vyeda claimed that he actually made a profit on his sales of fireworks, but admitted "I never ... really kept books on it." *Id.* at 7–8. Vyeda had purchased fireworks at least once in Nevada and Ohio, but what year this was or whether this was a common or unique event was never revealed. *Id.* at 6. Vyeda's legal fireworks apparently came from Red Devil in San Carlos, California. *Id.* at 8. The scale of this fireworks activity, the duration of the activity, and whether Vyeda customarily purchased

illegal fireworks out-of-state or obtained them in California are all unclear from the evidence.

Even taken together, the totality of the evidence on any of these activities does not rise to the level of proof beyond a reasonable doubt.

**6.** Vyeda allegedly gave four cases of liquor to Blair as part of the extorted payment: a case each of vodka, bourbon, gin and "scotch." Vyeda Transcript at 186. Vyeda's inability to recall the exact name brands of any of these types of liquors, coupled with expert testimony that bourbons, vodkas and gins can all be distilled in California, forces the government to rely solely on the "scotch" as its link to interstate commerce. *See Id.;* Robles Transcript at 27–28, 30. However, the identity of the "scotch" itself is uncertain. Vyeda testified that "the scotch was Canadian" and had either a "castle", a "coat of arms", "flags", or some combination of these on the bottle. Expert testimony, however, shows that there is no scotch made in Canada; by definition, scotch comes only from Scotland. Robles at 27. The alleged "scotch" therefore is either some liquor from Canada, true scotch from Scotland, some other unknown liquor from outside California, or else some liquor from inside California. *See generally* note 9, *infra*. Again, the proof falls far below that of reasonable doubt.

of an extortion scheme *customarily* obtains supplies through interstate commerce, the diminution of the victim's resources impairs his purchasing power and may therefore be found to affect interstate commerce for the purpose of the Hobbs Act." *United States v. Merolla*, 523 F.2d 51, 54 (2d Cir.1975) (emphasis in text). The depletion of assets theory requires that the victim's ties to interstate commerce be of a continuing nature; otherwise the nexus between the extortion and interstate commerce becomes "merely conjectural." *Id.; see also United States v. Elders*, 569 F.2d at 1025 (the victim business must be either "actively engaged" in interstate commerce or "customarily purchase" items in interstate commerce for a depletion of assets theory to apply).

The depletion of assets theory has been adopted by the Ninth Circuit. *See, e.g., United States v. Phillips*, 577 F.2d 495, 501 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978) ("the depletion of resources from a business engaged in interstate commerce.... has been consistently found an adequate jurisdictional basis [for Hobbs Act prosecutions]") (citing *Merolla*, 523 F.2d at 54; *United States v. DeMet*, 486 F.2d 816, 821 (7th Cir.1973)).

### i. *Anchor Electric*

■ The government argues as follows: first, that Vyeda was the sole proprietor of Anchor Electric, a local electrical business. Second, that as Anchor Electric, Vyeda purchased most of his electrical supplies at San Leandro Electrical Supply, located in San Leandro, California. Third, that SLE in turn purchased most of its electrical supplies from outside California. On the basis of these facts, the government reasons that the extortion payment made from Vyeda's personal assets diminished his ability to do business as Anchor Electric, which in turn reduced Anchor Electric's capacity to purchase electrical supplies from SLE, which in turn ultimately affected SLE's

ability to participate in interstate commerce. Thus a reduction of Vyeda's personal assets is purported to affect interstate commerce only through a series of intermediate steps. This proposed nexus between Vyeda's personal payment of extortion money and SLE's involvement in interstate commerce is too attenuated and speculative to provide the requisite effect on interstate commerce required for the assertion of Hobbs Act jurisdiction.

First, it is doubtful whether the depletion of assets theory applies at all when the victim of the extortion is an individual rather than a business. *See United States v. Buffey*, 899 F.2d 1402, 1406 (4th Cir.1990) ("[e]xtorting money to be devoted to personal use from an individual does not affect interstate commerce"); *United States v. Kaye*, 593 F.Supp. 193, 197 (N.D.Ill.1984) (the depletion of assets theory is not available when the victim is an individual as opposed to a business); *see also United States v. Mattson*, 671 F.2d 1020, 1024–25 (7th Cir.1982) (an extortion of wholly personal assets from an electrician who is merely employed by a company which does business in interstate commerce is too attenuated a nexus for Hobbs Act jurisdiction).

Here, Blair extorted money from Vyeda's personal and individual assets. Blair's extortion focused on obtaining money and property from Vyeda as an individual, with the promised quid pro quo being aid to Vyeda as an individual (i.e., getting Vyeda's felony fireworks charge dismissed), rather than providing some benefit for Vyeda's electrical business. The genesis of the extortion was Vyeda's personal difficulty, and not, for example, some licensing problem Vyeda had encountered while acting as Anchor Electric. Because the extortion payment was drawn from Vyeda's personal assets, the diminution of assets theory does not apply.[7]

---

**7.** As another court has noted, to hold (as the government argues) that the extortion of Vyeda's personal individual assets affected interstate commerce "would mean that the extortion of money from any individual in our society could arguably affect interstate commerce even

tually." *Mattson*, 671 F.2d at 1025. Even a withered imagination could conceive of an individual extortion victim *potentially* utilizing the personal money depleted by the extortion and purchasing some mail-order item from out-of-state. Speculating about what an *individual* po-

Second, even assuming that Vyeda and Anchor Electric were interchangeable and that Vyeda's ability to purchase goods as Anchor Electric was reduced by the extortion payment, the fact remains that Anchor Electric was not a business customarily involved in interstate transactions. Indeed, all evidence produced at trial demonstrated that Anchor Electric was a purely local concern. There was absolutely no indication that Anchor Electric had even once performed work out-of-state, employed any out-of-state worker or had ever hired a single subcontractor who worked out-of-state. Nor was it shown that Anchor Electric directly purchased any of its equipment or materials from out-of-state.

The sole link allegedly tying Anchor Electric with interstate commerce, a connection which is *not* alleged in the superseding indictment, is that Anchor Electric regularly purchased electrical supplies from SLE, a local supply store, and that SLE in turn purchased the majority of its supplies from out-of-state. This is too attenuated a connection to form a nexus between the Vyeda extortion and interstate commerce.

A similar argument was rejected by the Seventh Circuit in *United States v. Mattson*, 671 F.2d 1020. In *Mattson*, an electrician employed by Playboy Enterprises (a business engaged in interstate commerce) paid a bribe out of his personal assets in exchange for defendant's help in obtaining a supervising electrician's license.

The government argued that had the victim received the license, Playboy would have saved money, since Playboy could then supervise electricians "in house" rather than hiring an expensive outside supervisor. As a result of this extortion, Playboy would realize a cost savings, which would potentially increase its assets. *Id.* at 1025. It was this increase in Playboy's assets, the government contended, which would cause an effect upon interstate commerce. *Id.*

The court rejected this argument, holding that at most the connection with interstate commerce was between the extortion of the electrician and his position as a Playboy employee. *Id.* To add a second theoretical connection between Playboy's potentially increased assets and interstate commerce through speculatively "adding an additional party [Playboy] and more 'tying together' to the well-established depletion-of-assets analysis," was insufficient and "too indirect" to satisfy the jurisdictional requirement of the Hobbs Act. *Id.*

The nexus in the case before this court is even more remote. It takes an additional speculative leap to reason that SLE's potentially decreased assets would affect in-

tentially would have done is much more conjectural than simply noting what areas of commerce a business has customarily and historically involved itself in, and from this inferring likely areas of future involvement. For this reason, courts have refused to extend the already conjectural depletion of assets theory to the even more nebulous realm of individual behavior.

In this case, it is sheer speculation to suggest that Vyeda would have taken the extortion money and specifically used it as Anchor Electric, rather than simply keeping it in his personal money market fund or using it in some other noninterstate manner. To hold that the depletion of assets theory extends to Vyeda as an individual, and therefore mandates the conclusion that any depletion of Vyeda's individual funds necessarily affected interstate commerce, flies in the face of this uncertainty.

An individual may be extorted in a manner which affects interstate commerce if the actual extortionate payment *forces* the individual to perform a direct interstate transaction. In *United States v. Hoelker*, 765 F.2d 1422 (9th Cir.

1985), *cert. denied*, 475 U.S. 1024, 106 S.Ct. 1219, 89 L.Ed.2d 330 (1986), the indictment alleged that an individual victim was " 'threatened ... with physical violence in order to force ... [the victim] to sign [a life] insurance policy application [which] 'named defendant Hoelker as the beneficiary.' " *Id.* at 1424. The indictment further stated that the policy was " 'to be issued by the Kentucky Central Life Insurance Company ... a business engaged in interstate commerce,' " and that one of the defendants had "submitted the application to the company; and that he had contacted the company to have the policy approved." *Id.* Here the extortion was from an individual, but the actual property extorted necessarily required an interstate commercial transaction, namely the purchase of life insurance from an out-of-state company. The extorted "payment" itself forced the individual victim to perform an act of interstate commerce, by purchasing a life insurance policy. These facts provide no basis for applying the depletion of assets theory to an individual who provides a money payment from personal assets in exchange for anticipated personal benefit.

terstate commerce and therefore conclude that Vyeda's payment to Blair affected interstate commerce. In addition, since not every transaction Vyeda conducts is done as Anchor Electric, the alleged connection between the personal extortion payment and SLE's link to interstate commerce is even more tenuous than that connection found wanting in *Mattson.*

Furthermore, it is highly uncertain whether Vyeda's extortion payment *actually* had any effect, either positive or negative, on Anchor Electric's ability to do business with SLE. In fact, it appears that the extortion had no effect on Anchor Electric's course of business with SLE. SLE's owner testified that he and Vyeda had been personal friends since childhood. Because of this friendship and the fact that Anchor Electric was a "very low volume account," SLE had always allowed Anchor Electric to run an open account, paying at its leisure. Additionally, SLE never applied service charges against Vyeda when Anchor Electric's account became delinquent. Lee Transcript at 19–20. In other words, Anchor Electric was permitted great latitude in conducting business with SLE, could obtain materials on an open account, and pay without late-penalties whenever it was convenient. This testimony further weakens the already fatally attenuated alleged nexus between Vyeda's diminished assets and SLE's interstate commerce.

The reasoning articulated in *Mattson* is supported by an examination of Ninth Circuit cases in which the depletion of assets theory has been found to confer an effect on interstate commerce. These cases show that the depletion of assets theory has been applied only when the extortion victim was a business *directly involved* in interstate transactions. *See, e.g., United States v. Phillips,* 577 F.2d 495 (9th Cir.1978) (victim was trucking company engaged in interstate commerce).

In *United States v. Gates,* 616 F.2d 1103 (9th Cir.1980), defendants extorted money from two tourist businesses directly engaged in interstate commerce. The court upheld a depletion of assets nexus, finding that there was "no question that both businesses were closely connected with and dependent upon the interstate travel of vacationers." *Id.* at 1105. Similarly, in *United States v. Zemek,* 634 F.2d 1159 (9th Cir. 1980), *cert. denied sub nom. Carbone v. United States,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981), the extortion victim, a topless dancing establishment/tavern, was threatened with destruction by arson. The court found that since the tavern directly purchased supplies and hired employees from out-of-state, its destruction (which would completely deplete its assets) would undoubtedly affect interstate commerce. *Id.* at 1173 n. 20.

These cases illustrate that the Ninth Circuit has applied the depletion of assets theory only when the victim was a business directly engaged in interstate commerce. The court is unaware of any Ninth Circuit case which has found an effect on commerce, using the depletion of assets theory, when the victim was a purely local business "one step removed" from a business engaged in interstate commerce (i.e., a *Mattson* situation).

The court therefore finds that the government has failed on all of its depletion of assets theories.

### ii. *Sideline Ventures*

Vyeda's other activities, such as collecting memorabilia, selling softdrinks, etc., do not constitute continuing business endeavors. *See* note 5, *supra.*

Specifically, Vyeda's fireworks sideline was effectively terminated upon his June 27, 1985, arrest and subsequent conviction for illegal possession of fireworks. The government concedes that he was barred from engaging in this activity as a condition of probation. Even had the Vyeda/Blair scheme succeeded and the felony charge been dismissed, it nevertheless appears that Vyeda intended after his arrest to abandon the fireworks sideline permanently.[8]

---

**8.** Vyeda testified that he intended to give up the fireworks sideline. The government nevertheless argues that if the Vyeda–Blair extortion

scheme had been successful there is every reason to believe that Vyeda would have continued his 15-year-old fireworks business. This argu-

As for Vyeda's numerous other sideline activities, there is an almost complete lack of ·testimony as to their scope, duration, nature and volume. Certainly there is nothing which shows that a diminution of Vyeda's assets would affect interstate commerce through these activities.

### 3. "Scotch" From Liquor Barn

The government also contends that Vyeda's alleged purchase of one case of scotch from Liquor Barn as part of his extortion payment provides the requisite effect on interstate commerce. Vyeda testified that Blair asked him to provide four cases of liquor as part of the extortion payment: a case each of bourbon, vodka, gin and scotch. Since Vyeda could not remember the names of any of the brands and since the first three liquors may all have been manufactured in California, the government focuses on the scotch, which expert testimony shows by definition comes from out-of-state (i.e., Scotland). *See supra* note 6.

The government has not proved beyond a reasonable doubt that any liquor formed part of the extortion payment, much less any scotch. Vyeda's testimony regarding the liquor is not credible. Vyeda was unable to remember the brand of the "scotch," but testified that it was "Canadian scotch." This was directly contradicted by an expert witness' testimony that there is no such thing as "Canadian scotch." There is, therefore, considerable doubt as to whether Vyeda actually purchased a case of scotch or any other out-of-state liquor as part of the extortion. Nor is it clear that any liquor at all changed hands, since there is no corroborating evidence to support Vyeda's vague recollections.[9]

For this reason the court need not address the government's contention that a case of scotch purchased as part of an extortionate payment would in itself constitute an effect on interstate commerce. The court simply notes that the one-time simple purchase of an item which has already

ment simply ignores Vyeda's compelling testimony about his traumatic arrest experience. *See* Vyeda Transcript at 14–16, 94. It also ignores the fact that, had the scheme been successful, Vyeda would have paid approximately $12,000 merely to be relieved of a charge stemming from a fireworks sideline in which he was unsure whether he even made a profit. *See Id.* at 7. It strains credulity to suggest that there is "every reason to believe" that after this initial $12,000 loss, Vyeda would have gone straight back to selling fireworks, thereby risking another potential felony prosecution and yet another $12,000 payment to evade *that* charge. By advancing such an argument, the government reveals the weakness of the jurisdictional straws at which it is grasping.

**9.** Vyeda's testimony on many issues lacks credibility, perhaps due to the passage of time or perhaps because of his understandable anger and bias against Blair. An example is illustrative: the government's chief piece of evidence was a tape Vyeda had secretly recorded of a face-to-face conversation he had had with Blair in November, 1985. Vyeda claimed that he made this tape as an attempt to obtain a record of the entire Blair transaction. Vyeda Transcript at 182. Vyeda adamantly testified that once the tape was made, he never subsequently tampered with it or altered it. Upon listening to the tape, however, it is obvious that significant portions of the Blair/Vyeda conversation have been erased and that several subsequent conversations between Vyeda and third parties (e.g., Kathleen Costa), have been recorded over portions of the original Blair/Vyeda conversation.

Vyeda's only explanation for these erasures and overrecordings of the vital Blair conversation is that his granddaughter "was playing with the tape recorder" and made these alterations. Under cross-examination it was revealed that Vyeda's granddaughter was one or two years old at the time she allegedly "played" with the tape recorder. Vyeda had no explanation as to how his infant granddaughter was able to skillfully pick up the tape recorder and overrecord Vyeda's telephone conversation with Costa from exactly where the telephone initially rings until exactly where Vyeda says "Bye" to Costa, at which point the tape immediately returns to the underlying Blair/Vyeda conversation. *See Id.* at 83–88.

Nowhere on the tape is the liquor payment mentioned, despite Vyeda's testimony that he intended the tape to be a complete record of the extortion transaction. When questioned specifically about this lack of reference to the alleged liquor payment on the tape, Vyeda responded "my granddaughter might have erased it or played with it." *Id.* at 184.

Given these discrepancies and the lack of corroborating evidence, the court finds that all of Vyeda's testimony regarding the liquor payment lacks credibility. Nevertheless, the court has concluded that even if there was a liquor transaction, it does not provide an interstate connection for the reasons explained below.

"come to rest" inside a state would not automatically provide an effect on interstate commerce.[10]

#### 4. Withdrawal Of Money From A Bank

█ Finally, the government contends that Vyeda's mere withdrawal of the extorted cash from his money market account at Bank of the West provided the necessary effect upon interstate commerce. The government argues that a bank employee was necessary to cash Vyeda's checks, that the checks required cancellation through the bank's clearing center and that cash from the bank's operating funds was given to Vyeda. Although Bank of the West has branches only in California, it is federally insured and regularly wires money interstate. However, this argument must also be rejected.

The court is unable to find a single case in which merely withdrawing money from a bank to pay an extortion, without more, provides the necessary nexus with interstate commerce under the Hobbs Act. Indeed, in many cases where an effect on interstate commerce was deemed lacking, money was nevertheless withdrawn from bank accounts and checks were written to provide the extortionate payments.[11]

The government relies on two cases to bolster its novel proposition that Vyeda's mere withdrawal of money from Bank of the West affected interstate commerce. First, the government quotes language from *United States v. Murphy*, 768 F.2d 1518, 1531 (7th Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986), to the effect that "in a complex economy almost any movement of funds affects commerce to some degree." This sentence is merely broad dicta; an examination of the facts in *Murphy* shows that the jurisdictional nexus was provided by utilizing a depletion of assets analysis regarding victim law firms which paid bribes to defendant. *Id.* at 1530–31. The *Murphy* court found that "the [victim law firms] ... *regularly purchased* items in interstate commerce.... [one] law firm *regularly purchased* law books from out of state.... [another] *purchased* envelopes and stationery from New York. This ... evidence showed a regular connection between the lawyers and interstate commerce." *Id.* at 1530 (emphasis added).

---

**10.** In *Battaglia v. United States*, 383 F.2d 303, defendant was charged with extortion after forcing a bowling alley owner to remove a competitor's pool table in order to substitute a table supplied by defendant. Defendant claimed that although the first pool table that his actions caused to be removed from the bowling alley had been shipped in interstate commerce, it had nevertheless "come to rest" and therefore no longer affected interstate commerce. The *Battaglia* court found otherwise, stating that "'a deliberate act which tends to prevent articles from being used once they have reached their destination after being shipped in interstate commerce'" affects interstate commerce by damming up the stream of goods. *Id.* at 305–306 (quoting *United States v. Stirone*, 168 F.Supp. 490, 496 (W.D.Pa.1957), *rev'd on other grounds*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)).

The *Battaglia* court therefore relied on the narrow *Stirone* doctrine that a deliberate act, which "tends to prevent articles from being used" after having been shipped in interstate commerce, affects interstate commerce. *Id.* at 305. Since defendant had deliberately acted to prevent the first pool table from being used, commerce was affected.

In the instant case, Vyeda was simply a neutral purchaser of the item. No vandalism or

destruction of the "scotch" tending to prevent its normal use was involved. This does not fit the hydraulic "damming" imagery of *Stirone* and *Battaglia* instead appearing more akin to a "floating" along the stream of commerce analogy. It appears that this neutral purchase of an item "come to rest" in-state would not have any effect on interstate commerce.

**11.** *See, e.g., Mattson*, 671 F.2d at 1022 (victim withdrew $1,000 from his checking and savings account and raised another $2,000 by taking out a personal loan; no effect on interstate commerce); *Merolla*, 523 F.2d at 53–54 (victim wrote defendant a check for $1,300, signed over title to a house trailer, signed a contract release and a document falsely acknowledging the receipt of $25,000; no effect on interstate commerce); *Buffey*, 899 F.2d at 1403 (on a conspiracy to extort charge, holding that the victim would have paid the extortion out of his personal wealth which consisted of a $250,000 home, $50,000 in municipal bonds, over 50% of the stock in a company which did business interstate and $50,000 in certificates of deposit; no effect on interstate commerce); *Elders*, 569 F.2d at 1023 (kickback given upon receipt of check for $503.50, numerous other cash payments made; no effect on interstate commerce).

Thus, *Murphy* provides no support for the proposition that merely using a bank account is sufficient to provide a connection with interstate commerce.

The government also cites *United States v. Davis,* 707 F.2d 880 (6th Cir.1983), for support. In *Davis,* sheriff's deputies were extorted to pay money into the sheriff's "flower fund" and also into performing construction work on the sheriff's house. The *Davis* court found that several of the deputies received federal funds from the Comprehensive Employment and Training Act and the Emergency Training Act, and therefore that the diversion of these federal monies to the "flower fund" affected interstate commerce. *Id.* at 884. Furthermore, the materials used in construction work at the sheriff's residence were deemed to be in the flow of interstate commerce. *Id.*

*Davis* arguably represents an overextension of Hobbs Act jurisdiction, yet even in *Davis* the mere use of a bank account did not suffice as a basis for an effect on commerce. Rather, the court found it necessary to specifically detail and trace the diversion of enumerated government funds from named federal programs toward the extortion payment, in order to establish a nexus with interstate commerce. *Davis* therefore provides no support for the proposition that mere use of a bank account is "interstate commerce."

The government argues for an unwarranted and extreme extension of Hobbs Act jurisdiction. If mere use of a bank account provided a sufficient nexus to interstate commerce, then any extortion payment in which a check was written or cash was withdrawn from a bank would necessarily affect interstate commerce. It is difficult to imagine an extortion of money in which such transactions would not occur. This extension would effectively remove the interstate commerce element from the Hobbs Act statute; it is not supported by any case law.

Based on the above analysis, the court holds that Vyeda's withdrawal of money from Bank of the West had no effect on commerce as defined in the Hobbs Act.

CONCLUSION

Defendant has been accused in Count One of violating the Hobbs Act. After weighing the evidence produced at trial, the court finds that the government has not proved beyond a reasonable doubt the requisite element of an effect on interstate commerce. The court therefore holds that defendant RONALD E. BLAIR is hereby ACQUITTED of Count One of the superseding indictment alleging a violation of the Hobbs Act, 18 U.S.C. § 1951.

IT IS SO ORDERED.